Good morning, everyone. Welcome to the Ninth Circuit. There are a few cases we're gonna hear oral argument on today, but one matter is submitted on the briefs, and that is Walker v. National Technology and Engineering Solutions of Sandia. That matter is submitted on the briefs. Our first matter that we have is Nisbet v. Bridger, and let's see if we could have Ms. Jensen, whenever you're ready. Good morning. Good morning, Your Honors. May it please the Court, Reagan Jensen on behalf of Petitioner Dr. Nisbet. I'd like to reserve one minute for rebuttal. Very well. Your Honors, the fundamental premise of the Hague Convention is that parents must not be able to abduct their children and flee to some place that they believe will be more friendly to their desires about custody. Instead, local courts retain the power to decide issues of custody over the children who reside in their jurisdictions, and they must be allowed to make those decisions. Here, the mother violated both of these principles when she removed the children from their home without warning or permission, fled to the United States, and only then filed for custody in a jurisdiction that she believed would be more favorable. I guess I wanted to... Oh, boy. I guess I wanted to get something cleared up. In order for the Court to overrule the factual determination by the District Court judge, the standard is clear error, correct? Yes. All right. So explain to me why the District Court clearly erred in the factual determinations that they made about the habitual residence. Yes, Your Honor. So in this case, the District Court's finding was based off of coercion, alleged coercion by the father in keeping the mother in Scotland. But in doing so, the Court essentially conflated lack of consent to remove the children from the jurisdiction with coercion. Well, let me see. Do I have it clear that the Court found Ms. Ridger credible? Yes. And that's not clearly erroneous. All right. And in fact, when Ms. Ridger indicated that she was a caregiver, was that clearly erroneous? No, Your Honor. It might be me. I don't know. Let me... We'll figure this out here in a second. All right. So the... And apologies about the noise. So was the District Court judge then clearly erroneous as to the friends and family that the children did or did not have? No, Your Honor. It wasn't clearly erroneous, but the District Court entirely failed to adequately address the fact that the children had remained in the same home, in the same apartment, in fact, in Scotland for more than two and a half years, had attended school there, had medical care there, and had dental care there, which are all considerations that it needed to take account of because following Minaski, the Supreme Court's decision, the inquiry is through the eyes of the children, where they're at home. And where they've lived in the same place for the same time, it's generally a relatively straightforward consideration. The children were three and five at the time, correct? Two and four. Two and four. I'm sorry. Two and four. And the children, according to the mother, they had not established any of those connections, did they? According to the mother, no. But according to... And again, the court found her credible. Right. But the inquiry here is a totality of the circumstances test. So the intentions of the caregiver are relevant, but they can't be the only inquiry. And so we have to look at where the children resided, where the children felt like they were at home, and where they'd lived in the same place for more than two and a half years and hadn't lived anywhere else. That has to be something that the District Court considers. And here, they didn't adequately address that and instead found that there was coercion that prevented... Counsel, if we thought that the District Court was an error here, a clear error, would the mother be able to accompany the kids back to Scotland for any proceedings in Scotland? Your Honor, that's the second error that we think is the court made here on the grave risk determination. Critically, the District Court just assumed without any evidence that the mother could not return to Scotland. But under the grave risk test, she bears the exceptional and high burden of showing that... Okay. Aside from sort of allocating risk and sort of faulting people for not proving things, do we know anything about whether Scotland would allow her to come back for the purposes of defending her custody of her children? Under United Kingdom authority, yes, we believe that is the case. What is the case? That she would be able to return with the children for the determination of custody. And do we know what would happen if a Scottish court determined that she should be the primary custody giver, whether she would be allowed to stay in Scotland or whether they had some kind of a shared custody arrangement? We don't know, but it's up for the Scottish court to determine that in the first instance, not this court or a court in Oregon. The District Court, the legal expert Lange said that, thought that the question as to whether KRN had been wrongfully removed was fairly straightforward under Scottish law, but that of ACN was not because he was born in Jersey, which is a Crown protectorate and not part of the United Kingdom. So where does the inquiry shift for us to try to figure out whether Dr. Nisbet has custody rights or any kind of So Mr. Lange was opining on Scottish law and Scottish custody, but that's the wrong inquiry. The inquiry is whether under the Hague Convention, the father was exercising a right of custody. But what law would we look to to determine whether that was a right of custody? For KRN, Lange looked to Scottish law and said he, even though they were not married, he did have certain, he did have certain custody rights in KRN. But what about ACN? Do we have to look to law for that? Do we just not get an opinion on Jersey law? Would Scottish law look to Jersey law? So we can still look to Scottish law and under Scottish law, under Scottish law and under the Hague Convention, which is looking at whether or not the father was accessing or had a veto on removal, under the Hague Convention, that is a right of custody. What would give him a right of removal? The Hague Convention gives him that? Right. Under Abbott v. Abbott, the Supreme Court's decision, it's called a nay exeuate right, and it's essentially if the parent is exercising a right of veto on removal of the child, that is a right of custody under the Hague Convention. I thought that in that case, I thought that in that case, the parents had agreed to that. That was not conferred by law, but it was recognized because that's the way that sort of the parents had made their, had sort of arranged their family. It's possible, but under law, in this case, under the Scotland Act of 1995, there is as a matter of law, a right of veto on removal. But ACN is not a Scottish, is not a Scottish citizen. It's born in Jersey. So doesn't the recognition have to come from Jersey law? Now, would Scottish law recognize Jersey law? Do we even know what Jersey law says on this? I'm happy to provide supplemental briefing on Jersey law. I mean, it was just, I mean, Lange was very, very careful in saying, I'm not going to, I'm not going to weigh in on Jersey law. Here's what Scottish law provides. And he concluded that he could not show under Scottish law that Dr. Nisbet had custody rights in ACN. But it seems to me that that's not, that's a void in law, and therefore, we have to look to something else, which I assume would be Jersey law, but I'm not sure. And it doesn't seem that anybody's addressed that. Again, I'm happy to provide more supplemental briefing on Jersey law. But our position is that under Scottish law, the father would have a right of custody because he is recognized as a parent under Scottish law to the child. He's on the birth certificate. And so under Scottish law, would have that right of custody pursuant to the Hague Convention. Just to go back to the grave risk, unless you have any further questions, we do want to emphasize the fact that it was the mother's burden to show that she could not go back to Scotland with the children. And the district court just assumed this without deciding and essentially shifted the burden of proof to the father to determine or come up with ameliorative measures for the mother without actually adequately addressing the mother's alleged unwillingness to return. And we believe that was legal error under the grave risk exception, which is exceptionally high, extreme, only used in extreme cases, not where here there's no evidence of future harm to the children for the temporary period of custody. And with that, I'd like to reserve the remainder of my time. Thank you. Very well. Thank you. Good morning. Good morning. May it please the court and counsel. My name is Katrina Seipel, and I represent a Pele mother, Spirit Bridger, in this matter. This case is about a single mother who was trapped in a country due to both the COVID-19 pandemic and the course of relationship that she was in. Ms. Seipel, there's one point that I thought was totally missing in the analysis by the judge below, by Judge Emmergut, which was, I think it's uncontested that all the time that two years that the children were with a mother in Scotland, the financing of that stay was paid by Mr. Nisbet. That's correct. 100%, right? She didn't work. She didn't have any private assets or anything. That was never mentioned as part of being a caregiver. And it seems to me that if somebody is paying for care, he's pretty much of a caregiver. Don't you think that was a failure to consider something in the totality of the circumstances, which was clear error? I don't, Your Honor, because I do believe that the district court considered that. So under Manaski, the district court determined that based off of the totality of the circumstances, including this financial aspect, it played into... Could you point out to me where in the district court's opinion the district court recognizes that the father is paying the freight? I believe in the district court's written opinion. It includes analysis of how mother is stuck in this country with the children, how not only that she's coerced into remaining there, but also... How long had she been stuck in Scotland? How long has she been living there? It was a little over two years, Your Honor. No, that's not true. When did she first move to Scotland? In 2019. No, 2013. She had been there for years before the children were born. So, Your Honor, she lived in Scotland in 2013, and then she was back in Jersey for an extended period of time. And during that period, she's not lived in the United States. She's either been with his parents in Jersey or in his apartment in Scotland since 2013. That's correct, Your Honor. And when children are born, and they come back to Edinburgh with ACN, and then KRN is born, they are returned to the same apartment where she and Dr. Nisbet lived for many years together. She's in the apartment. He is providing money. He is participating, what, by video once a day, an hour? About that, yes. Okay. He's provided with an enormous sum of money. That's correct. $180,000. That's correct. That feels like that's financial support. And to follow up on Judge Bea's question, that feels like that might have been worth mentioning by the district court in the totality of the circumstances. I didn't see any place where the district court referred to the financing. Understood, Your Honor. What is required by the district court, and what this court has to turn to, is whether the district court completed a Minaski-compliant analysis. And in its analysis, whether its considerations, findings were clear error. Father has not shown that the district court's findings under Minaski are clear error. Okay. Do you have a case? What's the closest case that you can give us to this? I would say Smith out of the Fifth Circuit cited in my brief. I don't have the exact citation, but I can give it to you. In that case, the children were present in Argentina for more than two years, and the children's residence in Argentina was still not determined to be their habitual residence. And were the children born there? In Argentina, no. Okay. So they're not born there. Had the parents been living there before the children were born? Yes. I do believe that the parents had been living in Argentina. They then went to the United States, came back to Argentina. But I guess I have a question about the two years. I think in a vacuum, I think we see two years. I think in a vacuum, I think that's that's that's one thing. But what were the circumstances in this case where the children were there for two years? Because I thought it was that they had just moved back in 2019. And we're looking at the habitual residence of the children, right? So the children, for the first time, had been back in 2019. That was at the end of 2019. A second child was born, I believe, in February of 2020. And then what happened in March of 2020, where the world sort of stopped for a second and all borders essentially were closed? Wasn't that the case that happened? That's very correct, Your Honor. Yes, the COVID-19 pandemic happened. Mother intended to leave. And again, the district court found her credible that she intended to leave as soon as she had KRN. But then the COVID-19 pandemic happened, borders closed, she could not get out of the country, not to mention that KRN did not have a passport to leave the country. And so she was effectively stuck there. Well, there was another thing, wasn't it? Also, she testified about the fact that because Mr. Nisbet had killed his mother, because of that, she was still, at least she felt, under investigation. And she testified that she felt that she couldn't leave the country, correct? That's correct, Your Honor. So when we look at this, I think that the district court was looking at it from that perspective, don't you think? I do. I do believe that the district court properly applied the totality of the circumstances, looking at the coercion, the COVID-19 pandemic, the fact the baby didn't have a passport, the fact that mother was there. The baby did have a passport. The baby had a UK passport because she was a Scottish citizen. She didn't have a US passport. The baby did not have a way to leave the country based off of what is in the record. Right. But the reason that she didn't is because although her mother was a US citizen and she was eligible for a US passport, she was born in Scotland, lived the first two and a half years of her life in Scotland in an apartment owned by her father that was being paid for by her father, where she had regular contact with him by Skype. That was the only kind of contact he could have. It was an apartment her had lived in since 2013. And the district court concludes that there is no habitual residence, that these are nomadic people. The question that the district court had to ask was whether the children's presence in Scotland had the quality of being habitual. And because these children... Where else could they possibly have lived? There is no other country at play, your honor. And so these are kids without a home? Yes. The children would say that their home... Does that make any sense to you? It does. The children's home is with their mother. And where these children are too young to acclimatize to their surroundings, Monaskey specifically states that when that situation happens, when these children are too young to acclimatize to their surroundings, the district court should consider the circumstances and intentions of the caregiving parent. And that is exactly what the district court did here. Completed the Monaskey complaint analysis and it's... How long did Bridger wait before going to the United States after she obtained K.R.N.'s passport? She obtained father's signature on the passport paperwork. She received the passport approximately six months later. And I believe she testified at trial that's in the record that it was about a month following actually obtaining the passport that she was able to get out of the country. She had family that came and visited her in Scotland? That's correct, Your Honor. Her mother came and visited her? That's correct. So the children's grandmother came and saw the kids in Scotland? Yes, Your Honor. Yes, Your Honor. Turning to father's second assignment of error, he claims that the district erred in holding that the children would be subject to a grave risk of physical or psychological harm if they returned under Article 13. Now notably, the district court made two findings regarding Article 13. Not only that the children would be subject to a grave risk of physical or psychological harm, but also that they would be subject to an intolerable situation on its very face if they were returned because father is incarcerated. Now notably, it was not clear to me that father has appealed this finding regarding an intolerable situation. He has appealed only the grave risk of harm. So turning to that, father claims the district court expanded the narrow scope of this exception because there was no evidence of him directly, physically, or psychologically abusing the children. Now we aren't disputing that this isn't a case of father laying hands on his children. He was incarcerated. He's seen his children in person maybe three times in a controlled setting. So of course that's not what this case is about. This case is about in the unlikely circumstance that father is released from custody and these children are returned to his care of manipulation, coercion, control, aggression, and violence. Wait, counsel. This is a huge leap of faith. The Hague Convention is a forum selection clause and this all assumes that he is going to prevail in the Scottish courts. And yet all the Hague Convention is going to tell us is what court has primary jurisdiction over this. That would be the Scottish courts and there's just no guarantee whatsoever that the Scottish courts will be so foolish as to turn these kids back over to their father. They may give him some kind of limited visitation rights, maybe supervised rights, but that would be for the Scottish courts to determine. So why are we jumping all the way to grave risk? Because I thought the courts had said that the grave risk is the grave risk if they are returned for the purpose of the judicial proceedings. And he's institutionalized. There is no risk to his children. That's correct, Your Honor. The district court considered in the unlikely event that father is released, this is where grave risk comes into play. Now, turning back to that. Right, right. But there's no evidence he's going to be released. And again, the grave risk is the grave risk to the kids if they are returned to Scotland for the purposes of the judicial proceeding. And there is — there doesn't appear to be anything in the record that would suggest that the kids will not be safe in Scotland during the pendency of court proceedings in whatever family court setting we have in Scotland. So where's the — where's the problem? Where's the risk? I will answer your question, Your Honor, and then I do believe I'm out of time. The risk is in part because mother cannot return. Your Honor's asked my opposing counsel here if there was anything in the record about — And is that — she cannot return? She cannot return. She testified at trial that based off of her consultation with immigration lawyers, she has no status and she cannot return, and the district court found that credible. Okay. Where is that in the record? It is in her opinion, she writes, that mother cannot return, and I would be happy to submit a supplemental letter or briefing regarding the specific pages in the record of her testimony. And is that a relevant concern? It is, because the expert testified at trial — mother's expert testified at trial — how this plays into the analysis of how the children being taken from their only primary caregiver and returned to a country to the equivalent of a foster care system, how that could severely affect the children's development and psychological abilities. We found that to be irrelevant in the Cuellar case. That's the one where the father took the kids from Panama through Australia. And we said that we're not going to reward this kind of behavior by saying, well, the kids have now become acclimatized or dependent upon one parent and therefore are going to be traumatized if they're returned to the other parent, because that simply rewards everything that the Hague Convention is designed to prevent. Yes, I understand that, Your Honor. What I can say is that that was not the only consideration here. It wasn't the only consideration that Dr. Linda Poppleton testified to at trial, and it was not the only consideration that the district court considered. And because father has not shown that the district court's considerations, findings, and holdings are clear error, this court should affirm. Thank you. Any additional questions? No. All right. Thank you. And if we could increase your time to two minutes. We went a little over on the other side, so go ahead. Thank you, Your Honor. Just two quick points on rebuttal. To start, on this point about the mother not being able to return, the district court in its finding essentially skipped that step and just assumed and accepted her self-serving, the mother's self-serving testimony that she couldn't go back without adequately addressing whether or not that was true. You concede that the district court, though, found that she could not leave, though? No, Your Honor. I don't concede that. Or concede the country, Scotland? You concede that she testified that she couldn't leave and that the judge accepted that? No, I don't concede that. I don't see that anywhere in the record. And in doing so, the district court shifted this burden of proof to the father when it should have been on the mother to show that she couldn't go back. She didn't submit any evidence. And because the children have United Kingdom citizenship, she would be able to return. There is a way for him to get out, though, correct? There is, yes, Your Honor. Okay. And in fact, he petitioned and it was denied about a year ago, correct? Yes. Okay. But presumably, he's going to petition again. Presumably, yes. So there is a possibility that this man is going to get out, correct? Yes. But under the Hague Convention, this court needs to be deferential to Scottish courts in assuming that they can provide protection to the mother and children upon their return to determine custody during that limited period. On my second point, back to the habitual residence finding, and I'll be quick because I'm almost out of time. In trying to find the best case, this is entirely unprecedented. There is no decision where outside of infancy, there's been a finding of no habitual residence at all. Can you distinguish Smith, then? Yes. Smith was not a finding of no habitual residency. It was a finding of whether or not they were habitually resident in the United States or in Australia, I believe. And this makes sense because under the Hague Convention policy, to find no habitual residence takes them entirely outside of the Hague Convention's protections. Thank you, Your Honors. Thank you. The case of Nisbet v. Bridger will be submitted. I appreciate the arguments today. Thank you.
judges: BYBEE, BEA, MENDOZA